

Tagged Opinion

**ORDERED in the Southern District of Florida on July 26, 2007.**

Paul G. Hyman, Chief Judge
United States Bankruptcy Court

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:
M.T.G. LIMITED, INC.,

Debtor.
_____/

In re:
M.T.G. FINANCE, INC.,

Debtor.
_____/

CASE NO. 04-34768-PGH
CHAPTER 11
(Jointly Administered)

CASE NO. 04-34767-PGH
CHAPTER 11

**MEMORANDUM ORDER: 1) GRANTING IN PART AND DENYING IN PART POST CONFIRMATION COMMITTEE'S MOTION FOR DISGORGEMENT OF FEES; AND 2) DENYING FEE APPLICATION**

**THIS MATTER** came before the Court for trial on May 31, 2007, upon the following two related matters:

I.   *Fee Application* filed by Matthew Moler [DE# 361];

Post-Confirmation Committee's *Objection to Fee Application of Former Plan Administrator* [DE# 364];

AND

II.  Post-Confirmation Committee's *Motion for Disgorgement of Fees Paid to Former Plan Administrator* [DE# 366];

*Former Plan Administrator's Response to Motion for Disgorgement of Fees Paid to Former Plan Administrator* [DE# 371];

*United States Trustee's Limited Reply to Former Plan Administrator's Response to Post-Confirmation Committee's Motion for Disgorgement of Fees Paid to Former Plan Administrator* [DE# 391].

The Court, having heard argument of the parties, having considered the unopposed proffer of Heidi Feinman, the Assistant United States Trustee (the "UST"), and the testimony of Matthew Moler, the former Plan Administrator (the "FPA"), Ms. Rosa Phillips, the Chairwoman of the Post-Confirmation Committee (the "Chairwoman"), Deborah Menotte, the current Plan Administrator (the "CPA"), and Eric Moler, a current member of the Post-Confirmation Committee and its former Chairman (the "FPA's Father"), having reviewed the Court file, the exhibits in evidence, and having observed the demeanor of the witnesses, hereby makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

*Procedural History*

On July 18, 2006, this Court entered an *Order Confirming Joint Plan* [DE# 288] which in part, provided for turnover of the Debtor's assets, consisting primarily of

accounts receivable and causes of action to the Post-Confirmation Committee. The *Joint Chapter 11 Plan Proposed by the Official Committee of Unsecured Creditors; AFP Proponents; Giarratana Proponents; the Debtors; and the Noteholders Represented by Dovin, Malkin & Ficken* ("Plan") [DE #137] indicated that Bryon Smyl was to be engaged as the Plan Administrator. In addition, the First Amended Disclosure Statement [DE #158] indicated that Bryon Smyl was a managing director of XRoads Solutions, the Post-Confirmation Committee's financial advisor, and that his curriculum vitae was available on request. A review of the docket reflects that in April, 2005, Bryon Smyl submitted an application for professional employment with affidavit and he was hired with Court approval thereafter [DE #74]. Objections to several professional fee applications for preconfirmation services, including that of XRoads, were heard by the Court on June 23, 2006. It was disclosed at the hearing that Bryon Smyl had left the employ of XRoads and that he was prevented from serving as Plan Administrator due to contractual reasons [DE #295]. Thus, the *Order Confirming Joint Plan* provided that the Post-Confirmation Committee would meet and select a Plan Administrator within ten days of the order becoming final. Paragraph 4 of the *Order Confirming Joint Plan* named the five Post-Confirmation Committee members who continue to serve today: Mr. Tim Shumaker, the FPA's Father, Ms. Gaila Kalandros, Ms. Rosa Phillips and Ms. Barbara Edwards. Pursuant to Paragraph 4 of the *Order Confirming Joint Plan*, the Post-Confirmation Committee filed its *Notice of Selection of Plan Administrator* [DE# 296], selecting the FPA as Plan Administrator on August 16, 2006, However the Court was never asked to approve this selection.

At the January 23, 2007 Post-Confirmation Committee meeting, the FPA was terminated as Plan Administrator by unanimous vote of those eligible to vote. However, the FPA refused to step down. As a result, the Post-Confirmation Committee was required to file the *Post-Confirmation Committee's Motion for Removal of Matthew Moler, as Plan Administrator* ("Removal Motion") and the *Post-Confirmation Committee's Motion to Compel: (1) Turnover of Former Plan Administrator's Files, Case Information, Accounts, Books, Records, Computer, Related Software and Other Property; and (2) an Accounting* ("Turnover Motion"). Prior to the hearing on the Removal and Turnover Motions, the FPA resigned effective February 5, 2007.

*FPA's Relationship to Creditor/Partnership*

The Fassnacht Partnership, LLLP, (the "Partnership") a Georgia limited partnership, is the fourth largest unsecured creditor of the Debtor under the confirmed Plan (Claim No. 35 for $659,450.00). During a substantial portion of time in which the FPA was the Plan Administrator, the FPA was also: (1) the Managing Partner of the Partnership; (2) a General Partner of the Partnership; (3) the Registered Agent of the Partnership; and (4) an equity owner of the Partnership.

In 2005, the FPA's Father testified in litigation pending in Atlanta, Georgia that his son had an equity interest in the Partnership. The Chairwoman and Barbara Edwards, the Vice Chairwoman ("Vice Chairwoman") were present at this deposition, albeit in their personal capacities, and not on behalf of the Post-Confirmation Committee. The other Post-Confirmation Committee members, Gaila Kalandros and Tim Shumaker, were not present at the 2005 deposition in the Georgia state court action. The FPA's Father testified that he responded to interrogatories in the Georgia

4

state court action which revealed the FPA's interest in the Partnership. It is unclear whether these interrogatories from 2005 were served on the Chairwoman or the Vice Chairwoman.

The FPA admits that Counsel for the Post-Confirmation Committee repeatedly asked him to file a Rule 2014 disclosure of any conflicts and he either refused or believed that he was not required to do so since he was not a lawyer. The Chairwoman testified that she also periodically requested the FPA to file a conflicts disclosure. No such disclosure of the FPA's relationship to any creditor was made at any Post-Confirmation Committee meeting.

*The 3rd Distribution Tendered by the FPA*

In the Fall of 2006, the Post-Confirmation Committee authorized the first pro rata distribution to unsecured creditors of $2,000,000.00 and approved a reserve for future activity. In early January, 2007, the Post-Confirmation Committee authorized the second pro rata distribution to unsecured creditors of $725,000 and approved a reserve for future activity. Later that same month, following the Post-Confirmation Committee meeting requesting his resignation, the FPA unilaterally made a third pro rata distribution to unsecured creditors of $350,000.00 without Post-Confirmation Committee approval. Also, without Post-Confirmation Committee approval, the FPA unilaterally set a small reserve for the Debtor's pending fee application and a few thousand dollars for the Post-Confirmation Committee. The FPA sent a letter with the third distribution encouraging creditors to cash their checks quickly.

The FPA was aware that the Post-Confirmation Committee required an affirmative vote of three of its five members to constitute a binding decision of the Post-Confirmation Committee. The FPA chose to consult with only two Post-Confirmation

5

Committee members prior to making the third distribution. The Post-Confirmation Committee was not made aware of the existence of the impromptu meeting or the decisions rendered as a result of this meeting. The Chairperson testified that the Post-Confirmation Committee and the FPA were aware of the Post-Confirmation Committee's outstanding obligations to third parties, which the Post-Confirmation Committee cannot presently afford to fund.

*FPA's Payments to Himself for FPA Services*

The Post-Confirmation Committee allowed the FPA to be paid every 15 days, but requested that the FPA seek approval for his fees by providing copies of his fee request to the Post-Confirmation Committee and the UST. The FPA inserted such a requirement in his amended retainer letter which clearly provides that he will pay himself pursuant to the Post-Confirmation Committee's procedure as spelled out in Section 8.1 of the Plan. The FPA complied and provided such notice with each fee request.

The FPA received several objections to his fee requests: (1) On January 3, 2007 the Chairperson requested that the FPA not pay himself pending the next Post-Confirmation Committee meeting to be held January 23, 2007 to consider his fee request. At the January 23, 2007 Post-Confirmation Committee meeting, no resolution was reached and the Post-Confirmation Committee requested the FPA's resignation. (2) On January 11, 2007, the UST requested that the FPA not pay himself pending a resolution of her objections. On January 26, 2007, the UST reminded the FPA that her prior objection to his fees still stood. On January 28, 2007, the FPA acknowledged the pending objection. (3) On January 26, 2007, the Post-Confirmation Committee served and thereafter filed on January 29, 2007, its objection to fees in its *Post-Confirmation*

*Committee's Objection to Fees and Expenses Requested by Former Plan Administrator, Matthew Moler* [DE# 340].

The FPA acknowledges on page 3 of his Fee Application the schedule on which he bases the fees incurred during his employment [DE# 361]. According to the FPA's Fee Application, the last three payments he made to himself were dated January 18, 22, and 31, 2007. The last two payments were made by electronic debit on January 29, 2007 and February 9, 2007.

The FPA testified that he had mistakenly included in his retainer letter his agreement to provide notice of his fee requests to the Post-Confirmation Committee and the UST as set forth in Section 8.1 of the Plan, and that he had mistakenly sent the same cover note for each pay request to the Post-Confirmation Committee and the UST in accordance with Section 8.1 of the Plan. The FPA further testified that he believed that counsel to the Post-Confirmation Committee was bound by Section 8.1, but as the FPA, he was not so bound. The FPA also testified that despite receiving the objections, he paid himself since he had not heard anything further from the Post-Confirmation Committee regarding detailed concerns from the Chairwoman or from the UST, and since he did not believe that he was bound by Section 8.1 of the Plan.

*FPA's Unilateral Settlement of Accounts Receivable*

Upon the requests of the FPA, the Post-Confirmation Committee had, from time to time, authorized the lump sum settlement of certain accounts receivable in exchange for a lump sum payment. According to the CPA's review of the financial records, following the Post-Confirmation Committee's request for his resignation, the FPA quickly wrote off $73,799.84 of accounts receivable. At the time of her appointment, the CPA testified she was left with worthless accounts receivable and the collection of a

7

small bounced check to which the CPA had negotiated a payment plan. The CPA has virtually no accounts to administer and collect. The Chairwoman testified that the FPA's write off of $73,799.84 of accounts receivable was unapproved. Section 5.4(d)[1] of the Plan provided that the Plan Administrator could settle accounts receivable for more than 75% of the amount due. The FPA testified that such lump sum settlements of accounts receivable he negotiated were for more than 75% of face amount, and therefore did not require the Post-Confirmation Committee's authorization.

*FPA's Fee Application*

The FPA filed a Fee Application seeking compensation from February 1, 2007 through April 11, 2007 in the amount of $7,845.00. The Post-Confirmation Committee requested the FPA to resign at its meeting on January 23, 2007. The FPA refused but ultimately tendered his resignation on February 5, 2007, just days prior to the hearing on his removal for cause. The vast majority of the period covered by the Fee Application is for work done after the FPA's resignation.

## CONCLUSIONS OF LAW

The FPA seeks professional fees allegedly incurred in connection with his employment as Plan Administrator by the Post-Confirmation Committee. The Post-

---

[1] Section 5.4(d) Duties of Post Confirmation Committee. The duties of the Post-Confirmation Committee shall include (a) monitoring the activities of the Plan Administrator; (b) reviewing the prosecution of all adversary proceedings, including proposed settlements thereof where the proposed settlement is less than 75% of the amount sought in the proceeding; (c) reviewing proposed settlements of Disputed Claims where the Disputed Amount is greater than or equal to the threshold amount established in section 5.7(d) of the Joint Plan; (d) pursuing all claims and/or Causes of Action including objections to Claims on insiders as the term is defined in section 101(31) of the Bankruptcy Code; (e) monitoring the performance of all parties under the Mediated Settlements; and (f) performing such other duties that may be necessary and proper to effectuate the purposes of the Joint Plan.

Confirmation Committee objects to the FPA's Final Fee application and further seeks to disgorge all fees previously paid to the FPA.

**I.     *The Court has Jurisdiction over this Contested Proceeding.***

"The jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in and limited by statute." *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995). The contours of a bankruptcy court's post confirmation jurisdiction in Chapter 11 cases has been a subject of debate. Some courts find that the analysis of bankruptcy court jurisdiction under 28 U.S.C. § 1334 is not affected by the fact that a dispute might arise after confirmation. *In re Refrigerant Reclamation Corp. Of America,* 186 B.R. 78, 80 (Bankr. M.D. Tenn. 1995)(*quoting* Frank R. Kennedy and Gerald K. Smith*, In Postconfirmation Issues: The Effects of Confirmation and Postconfirmation Proceedings,* 44 S.C. L.Rev. 621, 632-34 (1993) "[S]ince the confirmation of a plan in a Chapter 11 cases does not terminate a case, there should be no change in basic jurisdiction of the court under 28 U.S.C. § 1334(a) & (b)"). Other courts find that a bankruptcy court's jurisdiction is circumscribed by confirmation of a plan. *See generally, Refrigerant Reclamation*, 186 B.R. 78 (surveying reported decisions limiting post-confirmation jurisdiction including: *Hospital & University Property Damage Claimants v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 7 F.3d 32, 34 (2d Cir.1993) ("A bankruptcy court retains post confirmation jurisdiction in a chapter 11 proceeding only to the extent provided in the plan of reorganization ... [Post confirmation jurisdiction] is defined [exclusively] by reference to the plan."); *Portfolio Lease Funding Corp., No 1 v. Seagate Technology, Inc. (In re Atlantic Computer Sys., Inc.),* 163 B.R. 704 (Bankr.

S.D.N.Y. 1994) (If the plan and the order confirming the plan conflict over retained jurisdiction, the plan controls.); *In re Jr. Food Mart of Ark., Inc.,* 161 B.R. 462, 463 (Bankr. E.D. Ark. 1993) (The Bankruptcy Code [i.e., 11 U.S.C. § 1141] envisions very limited jurisdiction over a Chapter 11 plan case after confirmation of the plan."); *Neptune World Wide Moving, Inc. v. Schneider Moving & Storage Co. (In re Neptune World Wide Moving, Inc.),* 111 B.R. 457 (Bankr. S.D.N.Y. 1990) (11 U.S.C. § 1141 controls to the extent to which the court may retain jurisdiction post confirmation; section 1141(b) confers limited post confirmation jurisdiction upon the bankruptcy court for the purpose of implementing the plan.)); *see also In re Landing*, 191 B.R. 160, 161 (E.D. Mo. 1996)("A Bankruptcy Court's jurisdiction may be affected by (A) the provisions of a confirmed plan, or (B) by specific language in the order of confirmation, or (C) by the facts and circumstances and nature of a particular post-confirmation matter, or (D) by the identities and relationships of the parties involved."). The Court further notes that the Plan itself contains numerous references to the necessity of a court order in the event that the Plan Administrator and the Post-Confirmation Committee fail to agree on certain matters.

      Therefore, the Court finds that it has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b)(2)(A). Furthermore, while there is some debate regarding a bankruptcy court's jurisdiction for post confirmation matters, it is generally agreed that bankruptcy courts retain jurisdiction over matters pertaining to the implementation or execution of the plan. Thus, the Court also has jurisdiction because in this matter the disputed issues involve the implementation and execution of the Plan.

II. *The FPA was a "professional" who was obligated to disclose his connections to the Partnership.*

Bankruptcy Rule 2014 requires a professional who seeks to be employed by the bankruptcy estate to disclose all of his connections with the debtor, creditors, or parties in interest. The purpose of the rule is to determine whether the professional is disinterested. *In re Keller Financial Services of Florida, Inc.,* 248 B.R. 859, 891 (Bankr. M.D. Fla. 2000). "These disclosure requirements are not discretionary. The duty of professionals is to disclose all connections with the debtor, debtor-in-possession, insiders, creditors, and parties in interest." *In re EWC, Inc.,* 138 B.R. 276, 279 (Bankr. W.D. Okla. 1992). "The scope of disclosure is much broader than the question of disqualification." *In re Granite Partner, L.P.,* 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998). "The professional must disclose all facts that bear on his disinterestedness, and cannot usurp the court's function by unilaterally choosing which connections impact on his disinterestedness and which do not. Even arguable conflicts must be disclosed." *Id.*

The Court notes that the Bankruptcy Code does not define the term "professional." However, courts addressing the issue have determined that the term "[p]rofessional person" is limited to persons in those occupations which play a central role in the administration of the debtor proceeding. *See e.g., In re American Tissue,* 331 B.R. 169 (Bankr. D. Del. 2005) (setting forth a six factor test to determine whether an entity or an individual is a professional). The FPA's Fee Application states that the requested fees are for "compensation for professional services rendered" which are further described by the FPA as accounting, professional and debt collection services. In addition, the *Notice of Selection of Plan Administrator,* which was filed with the Court,

identifies the FPA as a certified public accountant. Therefore the Court finds that the FPA is a professional person and that in his position as Plan Administrator he rendered professional services to the Post-Confirmation Committee.

Since the FPA is considered a "professional", the disclosure requirements of Rule 2014 apply to him. The proper course would have been for (1) the FPA to file a conflict disclosure statement as the Post-Confirmation Committee's counsel and the Chairwoman repeatedly requested and (2) the Post-Confirmation Committee to have filed an application to employ the FPA pursuant to 11 U.S.C. §1103. Rule 2014 does not operate independently of an application for employment subject to approval by the Court. While the Plan provides that professionals may be retained by the Plan Administrator without filing applications with the Bankruptcy Court or otherwise seeking approval of the Bankruptcy Court (Plan § 5.22) the Plan does not specifically provide such an exemption for the initial Plan Administrator.

According to the Plan and the First Amended Disclosure statement, Byron Smyl was to have been the initial Plan Administrator and parties in interest were advised that his curriculum vitae was available on request. In addition, Byron Smyl had previously filed with the Court an application for professional employment and a disclosure statement in connection with his preconfirmation retention as a financial advisor. However prior to confirmation, it became known that Byron Smyl would not be able to serve as Plan Administrator due to other contractual reasons. Following confirmation, the FPA was hired instead. The Plan provides that should the Plan Administrator not be able to serve, the Post-Confirmation Committee can appoint another individual

without the need of further Bankruptcy Court order. Plan § 5.5. However, Byron Smyl never assumed the Plan Administrator position. The FPA was appointed as the initial Plan Administrator. Although the Plan permits successor Plan Administrators to be appointed without court approval, the Plan does not say that the initial Plan Administrator is exempt from the Bankruptcy Code's application and disclosure requirements of disinterestedness for professionals. "Without crystal clear plan language excluding the court's oversight, there is no reason to deviate from the statutory appointment procedures for professionals." *In re Compuspeak, Inc.,* 268 B.R. 286, 291 (Bankr. D. Kan. 2001) (determining that special counsel hired to represent committee in prosecution of post-confirmation actions should have been approved by the court as a professional "because (1) the plan language does not dictate otherwise, (2) the plan language does not adequately disclose to plan voters the employment terms of special counsel, and (3) the plan language does not inform the voters that special counsel is exempt from showing lack of adverse interest." *Id.* at 287.)

      Although the FPA professed to be unfamiliar with bankruptcy proceedings, he admitted receiving repeated disclosure requests by counsel for the Post-Confirmation Committee who is very familiar with bankruptcy proceedings. The Court finds no justification for the FPA to have not disclosed his relationship to the Partnership. Professionals should <u>always</u> err on the side of disclosure and transparency when they are unsure of whether conflict disclosure is required. Thus even though a formal application and disclosure statement seeking Court approval was not filed, the FPA had an affirmative obligation to have formally disclosed his relationship to the Partnership to the entire Post-Confirmation Committee.

III. *The FPA's failure to disclose does not require disgorgement of all fees he received.*

"As courts of equity, bankruptcy courts have broad discretion regarding the professional fees awarded in bankruptcy proceedings." *In re Charis Hosp.,* L.L.C., 360 B.R. 190, 199 (Bankr. M.D. La. 2007); *In re Anderson,* 936 F.2d 199, 204 (5th Cir. 1991). "Moreover, ordering professionals compensated from the estate to disgorge fees lies within the court's inherent authority to regulate professional compensation in bankruptcy proceedings." *Charis Hosp.,* 360 B.R. at 199*.; In re Prudhomme*, 43 F.3d 1000, 1003 (5th Cir. 2002).

The Eleventh Circuit has previously stated that "11 U.S.C. 328(c) permits a court to deny compensation to professionals found not to be disinterested persons, but does not require a denial of fees in those circumstances. *In re Prince,* 40 F.3d 356, 359 (11th Cir. 1994). Furthermore, the Eleventh Circuit in *Prince* held that:

> The permissive nature of the language in Section 328(c) is clear. *See also Gray v. English,* 30 F.3d 1319, 1324 (10th Cir. 1994) *citing* Sen.Rep. No 95-989, 1978 U.S.Code Cong. & Admin.News 5787, 5825. And "[i]n the absence of actual injury or prejudice to the debtor's estate, this sanction [denial of fees] should not be rigidly applied." 2 Collier on Bankruptcy 328.04 at 328-34 (15th ed. 1994) (footnote omitted). When injury to the debtor's estate occurs, however, denial of fees is proper. The Tenth Circuit Court of Appeals recently stated in another bankruptcy fee compensation case that '[i]n exercising the discretion granted by the statute we think the [bankruptcy] court should lean strongly toward denial of fees, and if the past benefit to the wrongdoer fiduciary can be quantified, to require disgorgement of compensation previously paid that fiduciary even before the conflict arose." *Gray v. English,* 30 F.3d at 1324.

In re Prince, 40 F.3d 356, 359-360 (11th Cir. 1994). Therefore, the Court is authorized, but not required to deny compensation if an adverse interest appears.

Although the FPA should have filed a conflict disclosure statement pursuant to Rule 2014 in connection with an application for employment by the Post-Confirmation

14

Committee, the Court notes significantly that there has been no evidence presented that the Partnership received any special treatment or consideration in regards to the distribution of its allowed claim by the FPA.  Moreover, the Court also notes that at least three members of Post-Confirmation Committee knew of the FPA's relationship to the Partnership before his appointment as the Plan Administrator because of a prior state court proceeding. Finally, both the FPA <u>and</u> the Post-Confirmation Committee failed to follow the required application procedures for professional employment. Therefore, given that the there is no evidence of special treatment by the FPA to the Partnership, the Court finds that the disgorgement of all fees previously approved by the Post-Confirmation Committee and properly paid to the FPA is unwarranted. Notwithstanding this conclusion, had it been shown that the Partnership received special treatment on its allowed claim, the Court in an exercise of its equitable powers would have disgorged some or all fees paid to the FPA for what would have been a clear breach of his fiduciary duty. Therefore, although the FPA should have disclosed his relationship to the Partnership, the Court does not find that the FPA's failure to do so requires the disgorgement of all professional fees paid to him with the approval of the Post-Confirmation Committee.

IV.    *The FPA is Required to Disgorge Unauthorized Payments to Himself.*

"Confirmed bankruptcy plans are binding contracts that must be interpreted in accordance with applicable contract law." *In re Sugarhouse Realty, Inc.,* 192 B.R. 355, 362 (E.D. Pa. 1996).  As such, all parties are bound to the terms of the agreement. The Post-Confirmation Committee and the FPA derive their authority from the Plan as confirmed by the Court. Plan Section 5.1 directs that "the Plan Administrator shall act

15

as directed by the Post-Confirmation Committee and act in a fiduciary capacity for the interests of all holders of allowed claims." In addition, Section 5.4 states that the Post-Confirmation Committee shall "monitor the activities" of the Plan Administrator. Finally, Section 5.7 states that the Plan Administrator "shall have the authority on behalf of the Debtors, *after consultation with and approval of the Post-Confirmation Committee*," to take all actions authorized by the Plan (emphasis added). Although the Plan empowers the Plan Administrator to make certain decisions regarding settlement of some debts and the making of distributions, the Plan clearly delineates the authority of the Post-Confirmation Committee over the Plan Administrator. If the Plan Administrator acts before he receives any required Post-Confirmation Committee approvals, the Plan Administrator proceeds at his own peril. On those occasions when the Post-Confirmation Committee and the Plan Administrator cannot agree, they are required to bring the disputed issue before this Court.

It is evident from the record that the FPA violated the terms of the Plan when he paid himself after January 3, 2007 without the approval of the Post-Confirmation Committee. At the time the FPA made these payments to himself, the FPA had received objections from both the UST and the Chairwoman who expressly asked the FPA not to pay himself, and not to act in any capacity until the Committee's next meeting. Not only did the FPA ignore these requests, he also unilaterally liquidated all remaining assets of the estate, disbursed those proceeds to claim holders with a cover letter instructing them to cash the checks immediately, and left only a small reserve to pay himself under a final fee application. At the time the FPA was fully aware that the Post-Confirmation Committee was seeking to have him removed from his position for cause. The FPA's explanation concerning the validity of his actions is unpersuasive

16

given that he paid himself over unresolved objections and before the Post-Confirmation Committee's January 23, 2007 meeting, and given that even after receiving specific requests not to act, the FPA still liquidated the remaining assets and disbursed their proceeds to claim holders with a cover letter advising recipients to: "Be sure to cash the checks quickly". The FPA's credibility is further undermined by his testimony that he was not bound by the notice and objection procedures of Section 8.1 of the Plan and that he had mistakenly included in his retainer letter his agreement to provide notice of his fee requests to the Post-Confirmation Committee and the UST as set forth in Section 8.1, and that similarly he had mistakenly sent the same cover letter for each pay request to the Post-Confirmation Committee and the UST requesting payment for his services in accordance with Section 8.1.

The Court finds that the FPA violated the terms of the Plan by not adhering to the procedure for "Distributions" (Section 5.19(b)), by not creating and maintaining an adequate "Operating Reserve" (5.16(a) and 5.16(b)); and by paying himself over the Post-Confirmation Committee's objections. The FPA's actions were in violation of the contractual terms of the Plan. Therefore, the Court shall disgorge the three unauthorized payments the FPA paid to himself on January 18, 22, and 31, 2007 in the total amount of $18,550.59.

**V.    *The FPA's Final Fee Application* is Denied.**

The amount of compensation paid to professionals and the means by which compensation is paid is regulated by 11 U.S.C. § 330(a). Two main themes run through this section. *In re Tri-State Plant Food Inc.,* 273 B.R. 250, 259 (Bankr. M.D. Ala. 2002). "First, compensation may not be paid unless it is reasonable. . . . Second, the services

17

to be compensated must be necessary to the administration of the case. Professionals will not be paid for services which are not necessary to the administration of the estate." *Id.* Although the Post-Confirmation Committee requested the FPA to resign at its meeting on January 23, 2007, he refused to do so. Ultimately, the FPA resigned as the Plan Administrator on February 5, 2007. The FPA later filed his Fee Application seeking compensation from February 1, 2007 through April 11, 2007 in the amount of $7,845.00. The requested fees are unreasonable given that the FPA resigned effective February 5, 2007. The vast majority of the period covered by the Fee Application is for work allegedly done after his resignation. In addition, the Court in granting the Turnover Motion [DE #352] directed the FPA to turnover all files, accounts, records, computers, etc. to the CPA within two business days of the February 9, 2007 hearing. The FPA's Fee Application includes his time for turning over these Court ordered materials to the CPA as late as April, despite the FPA having been ordered to turnover said materials within two business days or by February 11, 2007. The FPA offered no justification for his failure to obey this Court's order or for his delay in turning over this material. The Court finds that the FPA's services between February 5, 2007 and April 11, 2007 were unnecessary to the administration of the estate and his request for fees is unreasonable. Therefore, the Court herewith denies the fees requested in the FPA's Fee Application.

## CONCLUSION

The outcome here underscores the risk of unsupervised post-confirmation liquidations. The Bankruptcy Code's provisions and rules governing professional employment must be followed by all parties to guard against the potential for improper

conduct. Not only did the FPA fail to satisfy the disclosure requirements for "professionals" under the Bankruptcy Code, both the FPA and the Post-Confirmation Committee failed to follow the proper procedure which would have been for the FPA to file a Rule 2014 statement in connection with an application for professional employment by the Post-Confirmation Committee. In the absence of evidence that the FPA gave the Partnership special treatment in regards to its allowed claim, the Court will leave undisturbed the fees previously approved by the Post-Confirmation Committee and properly paid to the FPA. However, the Court shall disgorge the unauthorized payments that the FPA paid to himself. Finally, the Court denies the FPA's Fee Application in full. The Court will enter a separate final judgment pursuant to Federal Rule of Bankruptcy Procedure 9021 in the Post-Confirmation Committee's favor for the disgorgement of the unauthorized payments of $18,550.59.

## ORDER

The Court, having considered the evidence presented at trial, the testimony of the witnesses, the argument of counsel, the applicable law, the submissions of the parties, and being otherwise fully advised in the premises, hereby

**ORDERS AND ADJUDGES:**

1. The *Fee Application* filed by the FPA in the amount of $7,845.00 is **DENIED;**

2. The Post-Confirmation Committee's *Objection to Fee Application of Former Plan Administrator* is **SUSTAINED;**

3. The Post-Confirmation Committee's *Motion for Disgorgement of Fees Paid to Former Plan Administrator* is **GRANTED IN PART** and **DENIED IN PART**. The Court herewith orders the disgorgement of the full amount of unauthorized payments the FPA paid to himself for professional fees dated January 18, 22, and 31, 2007. The FPA

shall repay the Post-Confirmation Committee the full amount of $18,550.59 within ten days of entry of this order, the total of which shall accrue post-judgment interest at the statutory rate prescribed by law.

###

Copies Furnished to:

Roy S Kobert, Esq. counsel to Post-Confirmation Committee
Matthew Moler
Heidi Feinman, AUST

Counsel for the Post-Confirmation Committee is directed to serve a copy of this Order on all interested parties not listed above.